SUMMERS, Justice
(dissenting).
I am in accord with the majority view in its holding that after the formation of *75 the unit by the Commissioner of Conservation affecting, among other lands, forty acres of the leased premises in Section 33, the leased lands outside that unit were held by production from that unit. I further agree that thereafter the formation of the voluntary unit in Section 32 authorized by the agreement between the parties resulted in a division of the lease obligations—not by operation of law, but by the express conventions of the parties. This concurrence is based upon the authorities cited by the author of the majority opinion supporting each of these propositions. It is apparent, too, as recognized by the majority, that what remains for decision primarily involves the interpretation of this lease contract which is the law of the case between the parties. Further than this, however, I cannot agree. I do not agree that the terms and conditions of the lease deny the lessee the right to voluntarily pool or unitize that portion of the leased premises lying outside the unit formed by the Commissioner of Conservation with a shut-in well previously drilled and located on lands other than the leased premises. It is my opinion that such a unit is authorized by the lease and should be considered to be producing if shut-in royalties are timely tendered.
The majority opinion holds that under the terms of the lease a well in a voluntary unit cannot be shut in and have the effect o'f maintaining lessee’s rights in force on the’ leased acreage within that unit unless the well is located on the lands described in the lease. T'o support its views the1 majority relies on Paragraph 7, Section (c) of the lease relating to shut-in gas wells and lieu royalty which grants the lessee the right to “discontinue the production of gas” under the condition that this right may be exercised “so long as there is a well or wells on the leased premises capable of producing gas * * To properly understand the meaning of “leased premises” resort must be had to Paragraph 14 of the lease. There we find this language : “As between the parties hereto the entire acreage so pooled into a drilling- or production unit or units shall be treated * * * as if it were included in this lease." Further, that paragraph, in defining what is to constitute production from a voluntary unit, reads: “If such operations be conducted on or production be secured from land in any pooled unit other than land covered by this lease, it shall have the same effect as to maintaining Lessors’ and Lessee’s rights in force hereunder as if such operations were on or such production from the land covered hereby, * * (Italics mine.)
Read together the language of these paragraphs, in my opinion, permits a shut-in well in a voluntary unit on lands other than those described in the lease to have the effect of maintaining lessee’s right under the lease insofar as the leased lands in that unit are concerned.
*77 Lessors’ expressed reason for contending that the well must be completed on the leased premises is stated in their brief as follows: “Such a requirement would force the lessee to either drill on the land leased or on a unit including some of the leasehold which was formed before the completion of the well and thus, it would prevent lessee from attaching the leased lands to some shut-in gas well and thereby perpetuating the lease at a nominal rental. This latter practice is one that has arisen in recent years where, because of tax consequences or otherwise, large oil and gas companies have sought to tie up as much land as possible by shut-in gas wells.”
This argument discloses that lessors do not now find the agreement entered into by them compatible with their present wishes or best interest under the circumstances. They are in effect saying that the “either before or after production” clause of the pooling agreement has no meaning, for they now take the position that the unit must be formed “before the completion of the well”. Moreover, having agreed upon the amount of the lieu royalty payments (which they refer to above as nominal rental) they cannot now be heard to say that the lieu royalty payments are not adequate and that the quoted provisions of Paragraph 7, Section (a) providing for the payment of lieu royalty in the amount of “$200 per year, payable quarterly” have no meaning. Such an interpretation is an effort to repudiate the lessors’ contractual obligations and deprive lessee of the fruits, of their contract maintained by rental payments over a period of almost ten years at the very moment when their investment and effort promise to bear fruition.
Furthermore, “attaching the lease”, i. e., unitizing the leased lands with other land, lessors argue, has the effect of perpetuating the lease at “some” nominal rental. The answer to the argument that the rental (lieu royalty) is nominal is that lessors should not have agreed thereto if they did not consider that rental adequate. The answer to the objection that the lease is perpetuated by attaching the leased premises by way of unitization to other lands on which a well has been drilled is that this argument fails to recognize that “attaching-the lease” (unitization) permits the lessors primarily to share in future production from the well to which the lease is attached as a result of the voluntary unitization, subject to the condition—as agreed upon—that it may be shut in pending production. The shutting in of the well does not permit the perpetuation of the lease indefinitely but upholds the lease only for the time during which lieu royalty payments may maintain the lease according to its terms which are as follows:
“The lessee may, from time to time, discontinue the production of gas, including its gasoline and condensate content, under the foregoing provi *79 sions of this section, provided, however, that the aggregate sum of the periods of such continuance shall not exceed ten (10) years.” Paragraph 7, Section (b).
It is unimportant in unitization whether a well is on the leased premises or other lands for the share the lessors enjoy in the unit production is not determined by the location of the well within the unit, but the lessors’ participation is determined by the proportion which the leased lands bear to the total unitized acreage. It can be pointed out that under these circumstances a lessor whose lands are not the situs of the drilling operations is relieved of the nuisance associated therewith and nevertheless enjoys the fruit of those operations; that not having one’s lands drilled upon, therefore, is an advantage a lessor in a producing unit enjoys over other lessors in that unit whose lands are occupied with drilling operations. I fail, therefore, to recognize the validity of the lessors’ argument. Even if the result were an advantage to the lessee it should not for that reason be reprobated for it is an advantage contracted for, flowing from the agreement of the parties and should be upheld by this court.
My interpretation of the foregoing would result in the conclusion that the unit formed after the well was drilled and shut in was authorized to be formed by that portion of Paragraph 14 which permits the formation of a voluntary unit “either before or after production”; that the well in that unit maintained the lease in effect insofar as the leased lands in the unit are concerned, provided lieu royalties were properly and timely tendered.
It would then become necessary to decide whether the lieu royalty tendered after the primary term but within the “quarterly” period provided for its payment is a compliance with the lease. I would resolve that proposition by saying that the shut-in well was in effect constructive production until the lieu royalty became past due and delinquent, that is, in this case, upon the expiration of the quarterly period computed from the date the voluntary unit was formed and the shut-in well consequently included in that unit.
To hold otherwise would be to say that the shutting in of a well results in forfeiture of the lease unless the lieu royalty is simultaneously paid. Such an interpretation would give no effect to the language of the lease which provides that lieu royalty is “payable quarterly”. Inasmuch as the lease did not provide that the lieu royalty payment was to be made in advance or at any other specified time within the quarter, such as the beginning or end of the quarter, the payment was properly made at any time during that quarterly period. Article 2057 LSA-Civ.Code; 52 C.J.S. Landlord and Tenant § 511; 32 Am.Jur., Landlord and Tenant, 462; 126 A.L.R. 565.
*81 By its interpretation of the lease the majority opinion decrees what I consider to be a harsh result. The lessee, by forming the voluntary unit in order to permit the lessor to share in a well he was not previously entitled to share in, thereby placed himself in a more onerous position than that which he occupied prior to the formation of the voluntary unit. This is true, inasmuch as the land affected by the voluntary unit would otherwise have been held by virtue of the production from the unit formed by the Commissioner of Conservation ; this latter unit having within its bounds forty acres of the leased premises.
By its decision the majority holds that this voluntary unitization by the lessee in order to further develop the premises of the lessor outside the unit formed by the Conservation Commission, although he was not at this time obligated to form a voluntary unit, brings about a forfeiture of the lease, simply because the well in the unit was not on the leased premises. To bring about such a result the language of the lease should be express, clear and unambiguous.
I respectfully dissent.